UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

BRANDY JAN                                                    PLAINTIFF
DONALDSON MILLER,


V.                                    CIVIL ACTION NO.  1:20-CV-194-HSO-RPM


COMMISSIONER OF
SOCIAL SECURITY,                                             DEFENDANT

## REPORT AND RECOMMENDATION

### I.      INTRODUCTION

On June 11, 2020, plaintiff Brandy Jan Donaldson Miller ("Miller") filed this action under 42 U.S.C. § 405(g), seeking judicial review of the denial by the defendant Commissioner of Social Security ("Commissioner") of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA") as well as denial of her claim for supplemental security income ("SSI") under Title XVI of the SSA. Doc. [1].

### II.      Procedural History

On September 25, 2017, Miller filed for DIB and SSI. Doc. [12], at 120, 210–15. The Social Security Administration ("Administration") consolidated her applications, then denied her claim initially and upon reconsideration. *Id.*, at 87–150. Thereafter, Miller requested a hearing before an Administrative Law Judge ("ALJ"). *Id.*, at 189–90. On June 4, 2019, Miller had a hearing in front of an ALJ. *Id.*, at 65–86.  On July 2, 2019, the ALJ ruled that Miller was not entitled to either DIB or SSI. *Id.*, at 11–24. Thereafter, Miller filed a timely appeal to the Appeals Counsel ("AC"), which denied her request for review, and the appeal, on April 7, 2020. *Id.*, at 5–9. This action followed. Doc. [1].

### III.    Relevant Facts

### A.  General

At filing, Miller was 40 years old. Doc. [12], at 22. She has a high school diploma, is currently married, and has three children from a previous relationship. *Id.*, at 404–5, 414. She worked as a pharmacy technician between 2008 and 2013. *Id.*, at 116. Miller also has an extensive history of cannabis abuse, *id.*, at 403, 409, 414, 443, 512, 537, 749, and frequently missing medical appointments, *id.*, at 401, 452, 458, 461. Over the past twenty years, Miller has been hospitalized on approximately six occasions for mental crises, though three hospitalizations occurred before 2012. *Id.*, at 238, 414, 713.

Miller also makes frequent visits to the emergency room ("ER"). On December 21, 2016, for example, Miller visited the ER after passing out in her car for a few seconds. Doc. [12], at 536. She did not exhibit post-seizure symptoms; and a CT scan revealed no brain abnormalities. *Id.*, at 536, 543. Likewise, no cardiopulmonary abnormalities were detected. *Id.*, at 545. Less than a month later, Miller went to the ER with complaints of serious abdominal pain. *Id.*, at 524. However, after tests were run, no abdominal abnormalities were detected. *Id.*, at 529. Thereafter, on September 22, 2017, Miller passed out in her bathroom after suffering from a syncopal episode. *Id.*, at 491, 497. Miller's EKG results were "relatively" unremarkable; and her CT scan results were normal.  *Id.*, at 498–99, 504. She was released from the hospital on that same date. *Id.*, at 491, 499. Finally, on August 14, 2017, Miller went to the ER with symptoms of painful urination and lower back pain. *Id.*, at 511. Her physical exam and urine test revealed no abnormalities. *Id.*, at 512.

Finally, on March 14, 2018, Michael E. Zakaras, PhD ("Dr. Zakaras") performed a consultive mental exam on Miller. Doc. [12], at 712–14. Dr. Zakaras observed that Miller had some mental

limitations. *Id.*, at 714. For example, he observed that Miller could not spell the word "world" backwards, had difficulty counting, and could not be trusted with money. *Ibid.* Nevertheless, Dr. Zakaras also observed that Miller knew the current president, could avoid obvious physical danger, undertake personal hygiene, and determine how many nickels are in a dollar. *Id.*, at 714. Indeed, Miller provided "decent" answers to questions requiring "common sense, reasoning, and judgment" as well as "excellent" proverb interpretations. *Ibid.* Dr. Zakaras concluded that Miller primarily suffered from major depressive disorder and, secondarily, suffered from an unspecified anxiety disorder. *Ibid.* He recommended that Miller continue her medical treatment with Lori Seybert, MS/PCMHT ("Seybert") and Brian Maher, MD ("Dr. Maher") at Gulf Coast Mental Health Center.[1] *Ibid.*

## B.  Relevant Medical Opinions

### i.    Vicki Prosser, PhD

On March 22, 2018, Vicki Prosser, PhD ("Dr. Prosser") reviewed the available medical records and formed her own medical opinion. Doc. [12], at 87–120; 20 C.F.R. § 404.1513(a)(2); 20 C.F.R. § 416.913(a)(2). In relevant part, Dr. Prosser first opined that Miller suffered from seven medically determinable impairments, including systemic lupus erthematetosus ("lupus"); inflammatory arthritis ("arthritis"); "depressive, bipolar, and related disorders" ("depression"); "anxiety/obsessive compulsive disorder (OCD)" ("anxiety disorder"); a personality disorder; and a substance abuse disorder. Doc. [12], at 94–95. She opined that depression, anxiety disorder, and personality disorder were Miller's only "severe" impairments. *Id.*, at 94–95, 110–11. She continued that Miller's subjective pain symptoms were only partially consistent with the objective medical evidence. *Id.*, at 97, 113. Dr. Prosser continued that Miller has moderate limitations in

---

[1] In light of a scrivener's error, Dr. Maher is misidentified as "Dr. Motus" in the record at times. Doc. [16], at 8.

several areas of mental functioning, including her ability to understand, memorize, and carry out detailed instructions; maintain attention and concentration for extended periods at time; respond to workplace changes; sustain an ordinary routine without special supervision; perform scheduled activities; maintain regular work attendance; and arrive punctually. *Id.*, at 98–100, 114–16. Nevertheless, Dr. Prosser opined that Miller had no discernible limitations in her ability to: (i) remember locations and work-like procedures; (ii) understand, remember, and carry out short and simple directions; (iii) make simple work-related decisions; (iv) ask simple questions and request assistance; (v) maintain socially appropriate behavior; (vi) adhere to basic standards of neatness and cleanliness; (vii) travel to unfamiliar places and use public transportation; and (viii) discern normal hazards and take appropriate precautions. *Ibid.* Dr. Prosser also opined that Miller had no physical limitations. *Id.*, at 110.[2] Ultimately, Dr. Prosser concluded that Miller was "not disabled." *Id.*, at 117.

### ii.    Dr. Kossman

After Miller sought reconsideration, Carol Kossman, MD ("Dr. Kossman") reviewed the available medical records and formed her own medical opinion. Doc. [12], at 121–46. Dr. Kossman concurred with Dr. Prosser that Miller suffered from the above-described impairments and that her only "severe" impairments were depression, an anxiety disorder, and a personality disorder. Doc. [12], at 129–30, 142–43. Dr. Kossman also concurred with Dr. Prosser's findings about Miller's subjective symptoms as well as physical and mental limitations. *Id.*, at 129–31, 142–44. Like Dr. Prosser, Dr. Kossman concluded that Miller was "not disabled." *Id.*, at 132, 145.

---

[2] While Glenn James, MD ("Dr. James") was technically responsible for evaluating Miller's physical limitations in the initial disability determination, neither Dr. Prosser's nor Dr. James' credentials are at issue in this case so the Court refers solely to Dr. Prosser here to avoid confusion. Doc. [12], at 110.

### iii.    Seybert and Dr. Maher

On May 16, 2018, Seybert and Dr. Maher formed their own medical opinion about Miller's mental functioning based on their "observations [of] and interactions[with]" Miller ("Seybert-Maher opinion"). Doc. [12], at 86, 723–28. They opined that Miller has "no useful ability to function, especially on a sustained basis," in several areas, including understanding and remembering very short, simple instructions; remembering work-like procedures; maintaining attention for two hours; sustaining an ordinary routine without special supervision; working with or near others without being "unduly" distracting; completing a normal workweek without interruptions caused by "psychological symptoms;" performing at a constant pace without an unreasonable number of rests; accepting criticism from supervisors; getting along with coworkers without unduly distracting them or "exhibiting behavioral extremes;" handling normal work stress; carrying out detailed instructions; setting realistic goals; dealing with stress at a skilled or semiskilled job; maintaining socially appropriate behavior; travelling to unfamiliar places; and using public transportation. *Id.*, at 725–27. Furthermore, she suffers from: a "marked" limitation on her ability to pursue daily living activities; "extreme" difficulty in maintaining social functioning; "frequent" deficiencies in her concentration, persistence, and pace; and "repeated" episodes of mental deterioration in the work setting. *Ibid.* Nevertheless, she has a "fair" ability to: carry out very short and simple instructions; maintain regular work attendance and punctuality; make simple, work-related decisions; ask simple questions and receive assistance; and be cognizant of, and avoid, hazards. *Id.*, at 725–27. Finally, Seybert and Dr. Maher opined that Miller would be absent from work at least three times per month. *Id.*, at 725.

## C. Hearing

At her hearing, Miller testified about the effect that her impairments have on her day-to-day life. Doc. [12], at 65–86. According to Miller, she rarely leaves her apartment because she is "stressed and nervous about everything" and fearful that she will not be around if needed at home. *Id.*, at 79. She also has difficulty concentrating, articulating her thoughts, and maintaining a single train of thought. *Id.*, at 81–82. Furthermore, Miller testified that she has tried several medications, but all eventually failed. *Id.*, at 82. She has also suffered from the side effects of these medications, including headaches, nausea, and "sedation." *Id.*, at 80.  Turning to her physical impairments, Miller testified that she can sit for about an hour—but needs to move around thereafter—and can only stand for roughly the time it takes to go grocery shopping. *Ibid.* Likewise, her ability to kneel, stoop, and bend is limited. *Ibid.* She did not testify to any further mental or physical limitations. *Id.*, at 82.

After Miller testified, the ALJ posed questions to the Vocational Expert ("VE"). First, the VE was asked to assume that a hypothetical individual was 43 years old and had education including two years of college. Doc. [12], at 83. Next, the VE was asked to assume that the individual could perform "light work" with additional limitations, including: sitting for no more than one hour at a time with an option to stand or walk for 15 minutes throughout an eight hour workday; never able to climb, ropes, ladders, or scaffolds; and only occasionally able to engage in other postural activities. *Id.*, at 83. *See also* Social Security Ruling 96–9P, 1996 WL 374185, at *6 (S.S.A. July 2, 1996) ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling.").[3] The ALJ continued that the individual is limited to simple, routine, and repetitive work, including only occasional brief

---

[3] *See also Fleming v. Kijakazi*, No. 4:20–CV–175–DAS, 2021 WL 4302237, at *2 (N.D. Miss. Sept. 21, 2021) (applying SSR 96–6P to cases arising under the new regulations).

interactions with coworkers; "no interaction with the public;" work with objects more than people; basic supervision; and only gradual changes to job duties and work environment. Doc. [12], at 83. Responding to this hypothetical, the VE concluded that the individual could perform jobs existing in the national economy. *Id.*, at 84. Changing the hypothetical slightly, the VE was asked to assume the above except that the individual was only capable of "sedentary," not "light," work. *Ibid.* In response to this hypothetical, the VE concluded that the individual would still be able to work. *Ibid.* Changing the hypothetical further to assume that the individual is 5'2" and 180 lbs., the VE concluded that jobs would still be available to that individual. *Id.*, at 84–85. Finally, changing the above hypothetical significantly, Miller's counsel asked the VE whether the individual could perform any job if she had no ability to remember work-like procedures, maintain attention for short periods of time, or finish a workday without interruption from "psychological symptoms." *Id.*, at 85. The VE responded that the individual could not perform any job in the economy. *Ibid.*

## IV.    ALJ's Opinion

In his opinion, the ALJ made the following findings of fact. First, the ALJ concluded that Miller has not engaged in substantial gainful activity since August 12, 2016. Doc. [12], at 16. The ALJ further found that Miller suffered from several "severe" medical impairments: disorders of the lumbar spine, arthritis, lupus, obesity, anxiety, and major depression. *Ibid.* Next, the ALJ concluded that Miller did not suffer from a severe impairment or combination of impairments that meets or medically equals the severity of one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*, at 17–19.

Then, the ALJ determined Miller's residual functional capacity ("RFC"). Doc. [12], at 19–22. The ALJ concluded that Miller could perform "light work" with additional limitations. *Id.*, at 23. In particular, Miller could occasionally lift, carry, push, or pull 20 lbs. and frequently lift 10 lbs.

*Id.*, at 19. Furthermore, while Miller can sit and stand for 6 hours of an 8-hours workday, she needed a sit/stand option, including "sitting as much as 1 hour at a time" and standing/walking for up to 15 minutes at a time. *Ibid.* As well, she could never climb ladders, ropes, or scaffolds, and only occasionally climb ramps/stairs, stoop, balance, kneel, crouch, and crawl. *Ibid.* Turning to her mental functioning, the ALJ determined that Miller's mental impairments did not preclude her from receiving basic supervision. *Ibid.* However, the ALJ otherwise limited Miller to: (i) "simple, routine, and repetitive type work with no interaction with the public;" (ii) occasional, brief interactions with coworkers; (iii) work "with objects more than people;" and (iv) only gradual changes in her job duties and work environment. *Ibid.* Thereafter, the ALJ concluded that Miller could not return to her past relevant work. *Id.*, at 22.

At step five, the ALJ found that Miller was a "younger" individual, aged 15–44, because she was 40 years old when she filed for DIB and SSI. *Id*., at 22–23. Further, the ALJ found that Miller had two years of college and could communicate in English. *Id.*, at 23. Thereafter, considering her age, education, work experience, and RFC, the ALJ concluded that a significant number of jobs, around 80,000, existed in the national economy that Miller could perform, including as a retail marker, mail clerk, surveillance system monitor, and dowel marker. *Ibid.* Thus, the ALJ concluded that Miller was not "disabled." *Id.*, at 23–24.

## V.     Standard of Review

Under 42 U.S.C. § 405(g), the Court's review is limited to two inquiries: "(1) whether the decision is supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" *Biestek v. Berryhill*, ––– U.S. –––, 139 S.Ct. 1148, 1154, 203 L.Ed.2d 504 (2019) (quotation omitted). It is "more than a mere scintilla and less than a preponderance.'" *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995) (quotation omitted). Finally, "[c]onflicts of evidence are for the Commissioner, not the courts, to resolve." *Perez*, 415 F.3d at 461 (citing *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002)).

## VI.    <u>Five-Step Process Generally</u>

A claimant is "disabled" as defined in the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a sequential, five-step approach to determine whether a claimant is so disabled. The steps include: "(1) whether the claimant is presently performing substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from doing past relevant work; and (5) whether the impairment prevents the claimant from performing any other substantial gainful activity." *Perez*, 415 F.3d at 461 (citing *Masterson*, 309 F.3d at 271–72).

The burden of proof is on the claimant at the first four steps. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The burden of proof shifts to the Commissioner at the fifth step to establish the existence of other available substantial gainful employment that a claimant can perform. *Fraga v. Bowen*, 810 F.2d 1296, 1301–2 (5th Cir. 1987). If the Commissioner identifies such employment, the burden shifts back to the claimant to prove that he could not perform the alternative work identified. *Id.* at 1302. Throughout the process, the ultimate burden of establishing disability remains with the claimant. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). "A

finding at any step that the claimant is not disabled ends the inquiry." *Garcia v. Berryhill*, 880 F.3d

700, 704 (5th Cir. 2018) (citing *Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987)).

## VII.    ANALYSIS

### A.  Seybert-Maher Medical Opinion

### i.    Who Can Author a Medical Opinion?

The Court begins with the issue of whether a "medical source," or only an "acceptable medical

source," can submit a "medical opinion" under the new regulations. Doc. [16], at 9. Under the new

regulations, a "medical opinion" is defined as follows:

> Medical opinion. A medical opinion is a statement from a *medical source* about
> what you can still do despite your impairment(s) and whether you have one or more
> impairment-related limitations or restrictions in the following abilities: (For claims
> filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition
> of medical opinion.)
>
> [20 C.F.R. § 404.1513(a)(2) (emphasis added).]

*See also* 20 C.F.R. § 416.913(a)(2). As used in this section, the Commissioner argues, the term

"medical source" actually only refers to an "acceptable medical source." Doc. [16], at 9. The Court

disagrees.

Starting with the regulatory text, *see, e.g.*, *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415, 204 L.Ed.2d

841 (2019), the terms "acceptable medical source" and "medical source" are separately defined

terms under the social security regulations; the term "acceptable medical source" refers to a more

restrictive list of qualifying sources than does "medical source." 20 C.F.R. § 404.1502(a), (d); 20

C.F.R. § 416.902(a), (d). In addition to giving the terms distinct definitions, the Administration

uses each term at specific points in the regulatory scheme, including—most relevant here—two

distinct definitions of "medical opinion." *Compare* 20 C.F.R. § 404.1527(a)(1),[4] *with* 20 C.F.R. §

---

[4] Under 20 C.F.R. § 404.1527(a)(1), a "medical opinion" is defined as follows:

404.1513(a)(2).[5] If the claimant filed for benefits before March 27, 2017, 20 C.F.R. §

404.1527(a)(1) applies and the claimant can only receive a "medical opinion" from an "acceptable

medical source." 20 C.F.R. § 404.1527(a)(1). On the other hand, if the claimant filed for benefits

on or after March 27, 2017, 20 C.F.R. § 404.1513(a)(2) applies and a claimant need only receive

a "medical opinion" from a "medical source." 20 C.F.R. § 404.1513(a)(2). In light of the above,

the Commissioner's reading of 20 C.F.R. § 404.1513(a)(2) both flies in the face of a plain and

unambiguous reading of the regulatory text and would obliterate the Administration's careful and

specific usage of the terms "acceptable medical source" and "medical source" throughout the

regulatory scheme. *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

Likewise, if applied throughout the regulatory scheme, the Commissioner's reading would render

the term "medical source" to be mere surplusage. *Cambranis v. Blinken*, 994 F.3d 457, 465 (5th

Cir. 2021). As such, the Commissioner's reading lacks textual support. Beyond the text, the

Administration itself clarified that, for claims filed on or after March 27, 2017, a "medical source,"

not only an "acceptable medical source," can submit a medical opinion. *Revisions to Rules*

*Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 82 Fed. Reg. 5844, 5850

(Jan. 18, 2017). Finally, other courts to address this issue have reached the same conclusion as this

---

Medical opinions. Medical opinions are statements from *acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

[20 C.F.R. § 404.1527(a)(1) (emphasis added). *See also* 20 C.F.R. § 416.927(a)(1).]

[5] Under 20 C.F.R. § 404.1513(a)(2), a "medical opinion" is defined as follows:

Medical opinion. A medical opinion is a statement from a *medical source* about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (For claims filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition of medical opinion.)

[20 C.F.R. § 404.1513(a)(2) (emphasis added). *See also* 20 C.F.R. § 416.913(a)(2).]

Court. *See*, *e.g.*, *Barnard v. Comm'r of Soc. Sec.*, No. 4:20–CV–00439–JHE, 2021 WL 4392074, at *5 n.6 (N.D. Ala. Sept. 24, 2021); *Myers v. Saul*, No. SA–20–CV–00445–XR, 2021 WL 4025993, at *6 (W.D. Tex. Sept. 3, 2021); *Soto v. Comm'r of Soc. Sec.*, No. 19–CV–4631 (PKC), 2020 WL 5820566, at *9 n.22 (E.D.N.Y. Sept. 30, 2020) (collecting cases).

Here, Miller filed for benefits on September 25, 2017. Doc. [12], at 120, 210–15. Thus, a "medical source," not only an "acceptable medical source," can render a "medical opinion" in this case. 20 C.F.R. § 404.1513(a)(2); 20 C.F.R. § 416.913(a)(2). The Commissioner's argument fails.

### ii.    Is Seybert a Medical Source?

Next, the Commissioner argues that the ALJ erred by acceptng the Seybert-Maher submission as a "medical opinion" because Seybert actually wrote the so-called "medical opinion" and is a nonmedical source. Doc. [16], at 9–10. If the Commissioner is correct, the ALJ had no duty to explain the persuasiveness of the Seybert–Maher submission in the first instance—for the simple reason that *only* a "medical source" can submit a "medical opinion." 20 C.F.R. § 404.1513(a)(2). Stated differently, the Commissioner would avoid judicial review of whether the ALJ's explanation about the persuasiveness of the Seybert-Maher submission was legally sufficient; after all, an ALJ must only explain the persuasiveness of a "medical opinion." 20 C.F.R. § 404.1520c(b)(2).

It is well-established that the Court must review the ALJ's decision based on the ALJ's offered reasoning and factual findings, *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."), not a *post hoc* rationalization offered by the Commissioner or this Court, *Pearson*, 2021 WL 3708047, at *6 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). That is, if the ALJ's "grounds are inadequate or improper,

the court is powerless to affirm[, i.e. rationalize,] the administrative action by substituting what it considers to be a more adequate or proper basis." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Here, while quite creative, the Commissioner substantively seeks to replace the ALJ's finding that the Seybert-Maher submission is a "medical opinion" with her own, contrary conclusion. *Compare* Doc. [12], at 22, *with* Doc. [16], at 9. The Commissioner's attempt to substitute the ALJ's conclusion for her own is plainly a *post hoc* rationalization. *See, e.g.*, *Chenery Corp.*, 332 U.S. at 196, 67 S.Ct. 1575. *See also Wagner v. Comm'r of Soc. Sec.*, 435 F. Supp. 3d 509, 516 (W.D.N.Y. 2020); *Makara S. M. v. Berryhill*, No. 3:18–CV–219–BH, 2019 WL 1356602, at *13 (N.D. Tex. Mar. 26, 2019); *Benton ex rel. Benton v. Astrue*, No. 3:12–CV–874–D, 2012 WL 5451819, at *8 (N.D. Tex. Nov. 8, 2012). Indeed, the Commissioner's argument would also result in unfairness to Miller. It is well-established that a claimant may submit additional evidence after the ALJ issues an opinion. *See, e.g.*, *Higginbotham v. Barnhart*, 405 F.3d 332, 335 (5th Cir. 2005). If the ALJ found that the Seybert-Maher submission was not a medical opinion at the administrative level, Miller could have submitted additional evidence before the AC about Seybert's credentials, which are at least state issued. Miss. Code Ann. § 93–15–103(k); 24 Code Miss. R. Pt. 3, R. 3.1. However, Miller had no reason to submit additional evidence about, say, Seybert's qualifications, in light of the ALJ's findings. For these reasons, this argument fails.

## B. Persuasiveness Explanation

### i.    Law

As noted above, since Miller filed for SSI and DIB "on or after March 27, 2017," the ALJ was required to apply the new regulations. 20 C.F.R. § 404.1520c; 20 C.F.R. § 416.920c(a). Through the new regulations, the Administration revised the procedures and standards for evaluating

medical opinions and prior administrative medical findings, abrogating the treating physician rule. *Revisions to Rules*, 82 Fed. Reg. at 5844. As such, ALJs are "no longer required to give controlling weight" to the opinions of treating physicians. *Pearson v. Comm'r of Soc. Sec.*, No. 1:20–CV–166–HSO–RPM, 2021 WL 3708047, at *4 (S.D. Miss. Aug. 11, 2021), *adopted*, No. 1:20–CV–166–HSO–RPM, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021) (citation omitted). Instead, ALJs are required to consider the persuasiveness of medical opinions from different medical sources. 20 C.F.R. § 404.1520c(b)(2). In evaluating persuasiveness, the ALJ considers five factors: (i) supportability; (ii) consistency; (iii) the source's relationship with the patient; (iv) the source's specialty; and (v) "other factors that tend to support or contradict" the opinion. 20 C.F.R. § 404.1520c(c).

The most important factors in evaluating persuasiveness are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). With respect to "supportability," "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." *Pearson*, 2021 WL 3708047, at *4 (quotation omitted). The regulations provide that "consistency" is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Ibid.* The ALJ is required to "*explain* how [h]e considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [Miller's] determination or decision." 20 C.F.R. § 404.1520c(b)(2) (emphasis added).

While the Administration has eschewed the old "hierarchies of medical sources" and the new regulations are not meant to "make evaluating evidence more difficult," an ALJ's written persuasiveness explanation is critical to his analysis. *See Pearson*, 2021 WL 3708047, at *5. For the federal judiciary, an inadequate written explanation "frustrates the Court's ability [to]

determine whether [claimant's] disability determination was supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20–1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021) ("It is not the role of a reviewing court to comb the record and imagine manifold ways in which the factors could have been applied to the evidence that was presented."). For a claimant, a legally "inadequate" explanation—that is, one that does not meet the minimum requirements set forth in the regulations—robs him of understanding the reasons why the Administration rejected his claim. *Hardy v. Comm'r of Soc. Sec.*, --- F.Supp.3d ----, No. 20–10918, 2021 WL 3702170, at *5–*7 (E.D. Mich. Aug. 13, 2021) ("'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases[.]'"). In order to provide an "adequate discussion" or "adequate explanation" about the persuasiveness of a given medical opinion, the ALJ must, therefore, provide sufficient analysis to allow the Court to *meaningfully review* whether his finding was supported by substantial evidence; the Court cannot be left to merely speculate about the reasons animating that finding. *See*, *e.g.*, *Pearson*, 2021 WL 3708047, at *5. Likewise, neither this Court nor the Commissioner can provide a *post hoc* rationalization for the ALJ's conclusions. *Pearson*, 2021 WL 3708047, at *5; *Ramirez*, 2021 WL 2269473, at *6. Nevertheless, the minimum explanation that 20 C.F.R. § 404.1520c(b)(2) demands from the ALJ is context-dependent and not susceptible to bright-line rules. *Cooley v. Comm'r of Soc. Sec*, No. 2:20–CV–46–RPM, 2021 WL 4221620, at *6–*7 (S.D. Miss. Sept. 15, 2021); *Moore v. Saul*, No. 3:20–CV–48–DPJ–MTP, 2021 WL 754833, at *3 n.1 (S.D. Miss. Feb. 26, 2021). Ultimately, the ALJ must set forth a "logic bridge" that links the medical evidence to his persuasiveness finding such that this Court can undertake a meaningful judicial review of whether that finding is supported by substantial evidence. *Pearson*, 2021 WL 3708047, at *5.

## ii.    Application

Here, Miller argues that the ALJ's persuasiveness finding was not supported by substantial evidence because his reasoning was "broad." Doc. [14], at 14. By making this argument, she conflates the regulatory requirement that the ALJ must "explain," i.e. "adequate discussion," his persuasiveness findings with the question of whether "substantial evidence" supported those findings. *Ibid.* These issues are legally distinct. Under the social security regulations, an ALJ is required to "explain" his persuasiveness finding insofar as "consistency" and "supportability" are concerned. 20 C.F.R. § 404.1520c; 20 C.F.R. § 416.920c. If the Court cannot determine the ALJ's reasons for finding a given medical opinion to be persuasive in the first instance, the Court cannot determine whether that finding is supported by substantial evidence. *Vaughn*, 2021 WL 3056108, at *11. In short, the question of whether an ALJ provided an "adequate discussion" to allow for meaningful judicial review is a threshold question that is addressed *before* reaching the issue of substantial evidence. *Cooley*, 2021 WL 4221620, at *6–*7. With this distinction in mind, the Court will address each question separately below.

Here, the ALJ's explanation of his persuasiveness finding as to the Seybert-Maher opinion was legally sufficient. *Pearson*, 2021 WL 3708047, at *5. Beginning with consistency, the ALJ explicitly incorporated his earlier point-by-point analysis of Miller's mental limitations into his persuasiveness explanation. Doc. [12], at 18–22. In that earlier discussion, the ALJ identified, cited to, and relied on largely consistent medical records. *Ibid.* For example, the ALJ relied on medical records spanning years from six different sources that consistently indicated that Miller was generally alert and cooperative; orientated to person, place, time, and situation; exhibited appropriate behavior, thought content, memory, judgment, and insight; and had average mood, affect, attention, and concentration. *Id.*, at 18, 21. Likewise, the ALJ pointed out that: (i) Miller herself concedes that she can grocery shop without issue; (ii) she maintains a strong, yearslong

relationship with her spouse; and (iii) she was able to concentrate and provide decent answers at her hearing. *Id.*, at 18. Then, the ALJ compared his findings to the Seybert-Maher medical opinion, which ascribed extreme mental limitations to Miller. *Id.*, at 723–28. Relying on and specifically identifying Miller's consistent examination findings, reported activities, and documented social interactions, the ALJ reasoned that Seybert and Dr. Maher's medical opinion contradicted the rest of the administrative record. *Id.*, at 22. In short, the ALJ built a clear bridge between the medical evidence and his finding that the Seybert-Maher opinion was inconsistent with the remainder of the administrative record. *Id.*, at 22.

Next, the Court turns to the sufficiency of the ALJ's supportability discussion. The ALJ reasoned that the Seybert-Maher opinion did not identify supporting medical records and failed to elaborate on what "observations [of] and interactions [with]" Miller supported their medical opinion. Doc. [12], at 22. The ALJ's discussion of supportability was undoubtedly terse. *Ibid.* As a rule of thumb, a terse discussion is more likely to result in legal error insofar as it is more likely to leave the Court in a position where it cannot review for substantial evidence. *See*, *e.g.*, *Cooley*, 2021 WL 4221620, at *6–*7. However, there is a distinction between a *terse* discussion and one that precludes *meaningful* judicial review. *Ibid.* Here, the ALJ's discussion was sufficient because the basis for his reasoning that Seybert and Maher's opinion lacked a basis in their own medical records was self-evident. Doc. [12], at 22. Upon a quick glance at the Seybert-Maher medical records, it is readily apparent that Seybert and Maher's opinion had little, if any, relationship to their records. *Compare* Doc. [12], at 612, 766–68, 772, 776, 781, *with id.*, at 722–28. On one hand, Seybert's treatment notes consistently reflect her observation that Miller was pleasant and cooperative, though sometimes "mildly" irritable and only engaging in sporadic eye contact. Doc. [12], at 612, 766–68, 772, 776, 781. Likewise, except for a single interaction, *id.*, at 614, Seybert

consistently observed that Miller's speech, behavior, appearance, affect, memory, judgment, and insight were "appropriate," not "illogical," "tearful," "slowed," or otherwise abnormal; she was also orientated to time, place, person, and situation; engaged in linear and logical thinking; and of "average intelligence." *Id.*, at 612, 766–68, 772, 776, 781. By contrast, in their medical opinion, Seybert and Maher opined that, *inter alia*, (i) Miller could not get along with coworkers without unduly distracting them or "exhibiting behavioral extremes;" (ii) she had "extreme" limitations on her ability to engage in socially appropriate behavior; and (iii) she lacked any ability to use public transportation. *Id.*, at 725–27. Considering the self-evident gulf between the Seybert-Maher medical records and medical opinion, it is readily apparent that the ALJ reasoned that the Seybert-Maher medical opinion lacked a basis in their own treatment records and was, thus, unsupported.

Ultimately, the ALJ sketched a picture about his persuasiveness finding that enables this Court to undertake a "meaningful review" about whether that finding was supported by substantial evidence. Cf. *Pearson*, 2021 WL 3708047, at *5.

### C. Was the ALJ's Finding that the Seybert-Maher Medical Opinion was Unpersuasive Supported by Substantial Evidence?

Next, the Court addresses whether the ALJ's finding that the Seybert-Maher opinion is unpersuasive is supported by substantial evidence. *Pearson*, 2021 WL 3708047, at *5. Once again, substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[,]'" *Biestek*, 139 S.Ct. at 1154 (quotation omitted), i.e. "more than a mere scintilla and less than a preponderance[,]'" *Ripley*, 67 F.3d at 555 (quotation omitted). Cf. Doc. [17], at 2.

Here, substantial evidence supported the ALJ's finding that the Seybert-Maher medical opinion was unpersuasive. First, and foremost, as noted above, Seybert and Maher's medical

opinion departed significantly from their own medical records. *Compare* Doc. [12], at 723–28, *with id.*, at 612, 766, 767, 768, 772, 776, 781. Furthermore, as the ALJ identified, Miller's medical records generally reflect that she was alert and cooperative; orientated to person, place, time, and situation; had appropriate behavior, thought content, memory, judgment, and insight; and had an average mood, affect, attention, and concentration. *Id.*, at 18, 21. Indeed, the ALJ pointed out that Miller's own statements and testimony reflect that she could do household work, maintain a relationship with her spouse, shop, undertake personal hygiene, and do certain financial tasks. *Id.*, at 18–19. Likewise, after examining Miller, Dr. Zakaras indicated that she retained "significant mental performance." *Id.*, at 712–14. Finally, the ALJ relied on and found persuasive Dr. Prosser's medical opinion that, while Miller *did* suffer from some mental limitations, she was still capable of performing a significant number of work activities. *Id.*, at 98–100, 114–16. For these reasons, substantial evidence supported the ALJ's finding that the Seybert-Maher medical opinion was unpersuasive.

### D.  Did the ALJ "Play Doctor?"

#### i.      Law

Finally, the Court addresses whether the ALJ failed to rely on a medical opinion addressing Miller's physical limitations in formulating his RFC and, if so, whether this error resulted in prejudice to Miller. Doc. [14], at 20–24.

The ALJ is responsible for determining a claimant's RFC, *Ripley,* 67 F.3d at 557, which is based on all of the relevant evidence in the record, 20 C.F.R. § 416.945(a)(1).  While a claimant bears the ultimate burden of proving her disability by establishing a physical or mental impairment, *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991); 20 C.F.R. § 416.916, an ALJ is dutybound to "fully and fairly" develop the facts relevant to a disability claim, *Carey v. Apfel*, 230 F.3d 131, 142

(5th Cir. 2000) (citation omitted); 20 C.F.R. § 416.945(a)(3). If an ALJ finds no medical opinion of record to be even partially persuasive, there is typically an evidentiary gap in the record between the claimant's raw medical data, impairments, and remaining ability to work. *Martin v. Berryhill*, No. 4:19–CV–115–JMV, 2020 WL 5089390, at *3 (N.D. Miss. Aug. 28, 2020) (collecting cases). Unless the remaining record "clearly establish[es]" the effect that the claimant's condition has on her ability to work, the ALJ must fill this gap with another medical opinion. *Ripley,* 67 F.3d at 557. In all but the narrow class of cases where the record "clearly establishes" the claimant's limitations, a persuasive medical opinion must be developed and relied upon, at least in part, by an ALJ. After all, an ALJ is a layperson, *Frank v. Barnhart*, 326 F.3d 618, 621–22 (5th Cir. 2003) (per curiam) (noting that "lay intuitions" and "common sense" about medical matters are "often wrong"), who cannot reach his own RFC by simply interpreting raw medical data, *Cooley*, 2021 WL 4221620, at *5. Stated differently, an ALJ cannot *completely* reject every medical opinion of record, "interpret[] the raw medical data, and impose[] a different RFC . . . .'" *Simoneaux v. Comm'r of Soc. Sec.*, No. CV 18–270–RLB, 2019 WL 2269916, at *8 (M.D. La. May 28, 2019).

However, even if the ALJ "played doctor," the claimant must still demonstrate that the ALJ's error resulted in prejudice. *Keel v. Saul*, 986 F.3d 551, 555 n.3 (5th Cir. 2021). To prove prejudice, the plaintiff must demonstrate that, absent the ALJ's error, the ALJ "could and would have adduced evidence that might have altered the result." *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984). Nevertheless, "[a] mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden." *Jones v. Astrue*, 691 F.3d 730, 734–35 (5th Cir. 2012) (citation omitted).

### ii.    Application

Here, assuming *arguendo* that the ALJ "played doctor," Miller failed to demonstrate prejudice. First, Miller argues that the ALJ's failure to comply with his legal obligations under the regulations itself demonstrates prejudice. Doc. [14], at 23. This argument lacks merit. Even if the ALJ needed to collect certain evidence to avoid *legal* error, merely pointing this out does not, without more, equate the possibility of a different decision. *Jones*, 691 F.3d at 734–35. Likewise, if the ALJ's failure to develop the record was sufficient to mandate remand without more, the prejudice prong would be rendered redundant or, worse, meaningless. Cf. *Keel*, 986 F.3d at 555 n.3

Next, Miller argues that her raw medical records demonstrate that she was prejudiced. Doc. [14], at 20–24. However, there is no indication that *additional* records would have changed the decision in this case. *Jones*, 691 F.3d at 734–35 (citation omitted). First, and most importantly, the only medical opinions of record, which the ALJ rejected, concluded that Miller had neither "severe" impairments nor physical limitations. Cf. *Simoneaux*, 2019 WL 2269916, at *8 (rejecting medical opinions that placed greater limitations on plaintiff). That is, unlike the only medical opinions of record, the ALJ concluded that Miller *had* physical impairments and limitations. *Ibid.* Furthermore, Miller had the opportunity to, and did, testify about her physical limitations at her hearing. Doc. [12], at 65–82. Indeed, her attorney asked her questions about her physical limitations. *Id.*, at 78–82. After she testified, the ALJ incorporated *all* of Miller's self-described physical limitations and even included *additional* limitations, unclaimed by Miller, into his VE hypothetical and, ultimately, his RFC. Doc. [12], at 19, 81, 83; *Carey v. Apfel*, 230 F.3d 131, 142–43 (5th Cir. 2000). In responding to the ALJ's relevant hypothetical indicating more limitations, the VE concluded that Miller's self-described physical impairments *coupled with* her mental impairments did not support a finding of disability. Doc. [12], at 19, 81, 83. Indeed, Miller's counsel did not diverge from the ALJ's hypothetical physical limitations in his own hypothetical

question to the VE. *Id.*, at 85. Since Miller's own testimony is consistent with a finding of non-disability, the only medical opinions of record concluded that she had no physical impairments whatsoever, and Miller can only point to raw medical data to refute her own testimony, the Court cannot conclude, without engaging in wholesale speculation, that the ALJ *might* have reached a different result if he sought a medical opinion. *Jones*, 691 F.3d at 734–35 (citation omitted) ("A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden."). In short, while the remainder of the administrative record contains medical evidence that an additional medical source should have synthesized, Miller has failed to establish prejudice. *Ibid.* This argument fails.

## RECOMMENDATION

Based on the foregoing, the undersigned recommends that the Commissioner's decision should be affirmed and Miller's Complaint dismissed with prejudice.

## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court.  A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections.  Such party shall file the objections with the Clerk of the Court and serve the objections on the District Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within fourteen (14) days after being served with a copy

shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed

factual findings and legal conclusions that have been accepted by the district court and for which

there is no written objection. *Douglass v. United Services Automobile Association*, 79 F.3d 1415,

1428–29 (5th Cir. 1996).

  **SO ORDERED AND ADJUDGED**, this the 17th day of December 2021.

       /s/ *Robert P. Myers, Jr.*
       ROBERT P. MYERS, JR.
       UNITED STATES MAGISTRATE JUDGE